1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

* * *

7

UNITED STATES OF AMERICA,

Case No. 2:16-cr-00046-GMN-PAL

8

Plaintiff,

**ORDER**
– AND –

9

v.

**REPORT OF FINDINGS AND**
**RECOMMENDATION**

RYAN C. BUNDY,

10

Defendant.

(Mots. to Dismiss – ECF Nos. 1030, 1031;

11

Mots. to Strike – ECF Nos. 1127, 1129)

12        This matter is before the court on Defendant Ryan C. Bundy's Motion to Dismiss on the

13    Grounds of Insufficient Nexus With Interstate Commerce (ECF No. 1030), and Motion to Dismiss

14    on Grounds of Multiplicity (ECF No. 1031), both filed November 28, 2016 (jointly, the "Motions

15    to Dismiss").  Also before the court are the Government's Motions to Strike (ECF Nos. 1127,

16    1129) the Motions to Dismiss as untimely.  These Motions are referred to the undersigned pursuant

17    to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice.  The court has

18    considered the Motions, the Government's alternative Responses (ECF Nos. 1127, 1129), and

19    Ryan Bundy's Replies (ECF Nos. 1162, 1163).

20                                          **BACKGROUND**

21    **I.      THE SUPERSEDING INDICTMENT**

22        Defendant Ryan Bundy and 18 co-defendants are charged in a Superseding Indictment

23    (ECF No. 27) returned March 2, 2016, alleging 16 separate counts.  The superseding indictment

24    arises out of a series of events related to a Bureau of Land Management ("BLM") impoundment

25    of Cliven Bundy's cattle following a two-decade-long battle with the federal government.

26    Beginning in 1993, Cliven Bundy continued to graze cattle on land commonly referred to as the

27    "Bunkerville Allotment" without paying required grazing fees or obtaining required permits.  The

28    United States initiated civil litigation against Cliven Bundy in 1998 in the United States District

Court for the District of Nevada.  The court found that Cliven Bundy had engaged in unauthorized and unlawful grazing of his livestock on property owned by the United States and administered by the Department of the Interior through the BLM.  The court permanently enjoined Cliven Bundy from grazing his livestock on the Allotment, ordered him to remove them, and authorized the BLM to impound any unauthorized cattle.  Bundy did not remove his cattle or comply with the court's order and injunction. The United States went back to court.  Subsequent orders were entered in 1999 and 2013 by different judges in this district permanently enjoining Bundy from trespassing on the Allotment and land administered by the National Park Services ("NPS") in the Lake Mead National Recreation Area,[1] ordering Bundy to remove his cattle, and explicitly authorizing the United States to seize, remove, and impound any of Bundy's cattle for future trespasses, provided that written notice was given to Bundy.

On February 17, 2014, the BLM entered into a contract with a civilian contractor in Utah to round up and gather Bundy's trespass cattle.  BLM developed an impoundment plan to establish a base of operations on public lands near Bunkerville, Nevada, about seven miles from the Bundy ranch in an area commonly referred to as the Toquop Wash.  On March 20, 2014, BLM also entered into a contract with an auctioneer in Utah who was to sell impounded cattle at a public sale.  Bundy was formally notified that impoundment operations would take place on March 14, 2014.  The following day, Bundy allegedly threatened to interfere with the impoundment operation by stating publicly that he was "ready to do battle" with the BLM, and would "do whatever it takes" to protect "his property."  The superseding indictment alleges that after being notified that BLM intended to impound his cattle, Bundy began to threaten to interfere with the impoundment operation, and made public statements he intended to organize people to come to Nevada in a "range war" with BLM and would do whatever it took to protect his cattle and property.

The superseding indictment alleges that, beginning in March 2014, the 19 defendants charged in this case planned, organized, conspired, led and/or participated as followers and gunmen in a massive armed assault against federal law enforcement officers to threaten, intimidate,

---

[1]  By 2012, Bundy's cattle had multiplied and he also began grazing his cattle on land administered by the NPS in the Lake Mead National Recreation Area without obtaining grazing permits or paying grazing fees.

and extort the officers into abandoning approximately 400 head of cattle owned by Cliven Bundy. The removal and impoundment operation began on April 5, 2014. On April 12, 2014, defendants and hundreds of recruited "followers" executed a plan to recover the cattle by force, threats, and intimidation. Defendants and their followers demanded that officers leave and abandon the cattle and threatened to use force if the officers did not do so. The superseding indictment alleges armed gunmen took sniper positions behind concrete barriers and aimed their assault rifles at the officers. Defendants and their followers outnumbered the officers by more than 4 to 1, and the potential firefight posed a threat to the lives of the officers, as well as unarmed bystanders which included children. Thus, the officers were forced to leave and abandon the impounded cattle.

After the April 12, 2014 confrontation with federal officers, the superseding indictment alleges that the leaders and organizers of the conspiracy organized armed security patrols and check points in and around Cliven Bundy's Bunkerville ranch to deter and prevent any future law enforcement actions against Bundy or his co-conspirators, and to protect Bundy's cattle from future law enforcement actions.

## II.    RELEVANT PROCEDURAL HISTORY

Ryan Bundy and 18 co-defendants are charged in a Superseding Indictment (ECF No. 27) returned March 2, 2014. All 19 defendants made their appearances in this case in this district between March 4, 2016, and April 15, 2016. At the initial appearance of each defendant, the government stated its position that this was a complex case that would require special scheduling review. All 19 defendants are currently joined for trial pursuant to the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 ("STA"). On April 22, 2016, the court held a scheduling and case management conference to determine whether this case should be designated as complex. Eighteen of the 19 defendants appeared with their counsel. Ryan Bundy appeared pro se with standby counsel, Angela Dows. The positions of each of the defendants were stated on the record during the hearing and later memorialized in a Case Management Order (ECF No. 321) entered April 26, 2016. The court found the case was a complex case within the meaning of 18 U.S.C. § 3161(h)(7)(B)(ii), and set the trial for February 6, 2017. The case management order also set deadlines for filing motions to sever, pretrial motions and notices required by Rule 12 of the Federal Rules of Criminal

1   Procedure[2] and LR 12(1)(b).  No defendant filed objections to the case management order.

2   On September 20, 2016, Defendant Peter T. Santilli filed a Motion to Continue Case

3   Management Rule 12 Motions and Notices Deadline by 30 Days (ECF No. 672).   While this

4   motion was pending, on September 26, 2016, Ryan Bundy filed a Motion for Joinder (ECF

5   No. 680) to Santilli's request through his standby counsel.  In his joinder, Ryan Bundy indicated

6   that additional time was needed because he was "in the middle of a federal jury trial in the District

7   of Oregon."  *Id*.  However, Santilli subsequently filed a Motion to Withdraw (ECF No. 689) his

8   request for continuance, which the court granted.  Because the underlying motion to continue was

9   withdrawn, the court denied Ryan Bundy's request for joinder.  *See* Order (ECF No. 802).

10  However, the court granted in part his request for an extension of the Rule 12 motions deadline,

11  extending the deadline until October 17, 2016.  *Id*.  Ryan Bundy did not seek another extension.

12  Approximately six weeks after the extended deadline had passed, on November 28, 2016, he filed

13  the Motions to Dismiss.

14  ### DISCUSSION

15  **I.   THE GOVERNMENT'S MOTIONS TO STRIKE RYAN BUNDY'S MOTIONS TO DISMISS**

16  The court will first address the government's Motions to Strike (ECF Nos. 1127, 1129) as

17  they ask the court to deny Ryan Bundy's Motions to Dismiss as untimely without addressing their

18  merits.

19  **A. The Government's Motion**

20  In response to Ryan Bundy's current motions, the government filed motions to strike, or in

21  the alternative, responses in opposition to his motions.  The government points out that the Case

22  Management Order (ECF No. 321) initially ordered all Rule 12 motions be filed by October 3,

23  2016.  The court later extended Ryan Bundy's deadline to file Rule 12 motions until October 17,

24  2016.  Inexplicably, and without leave of the court, Bundy filed his Motions to Dismiss on

25  November 28, 2016, six weeks after his deadline expired.  He provided no reason for his delay.

26  Given the number of defendants charged in this case and the numerous pretrial motions

27  that were anticipated and filed by the initial October 3rd deadline, adherence to the Case

28  ---
[2]  All references to a "Rule" or "Rules" in this Order refer to the Federal Rules of Criminal Procedure.

Management Order and requests for deadline extensions are necessary to ensure fair and efficient case management. The court might ordinarily provide a *pro se* defendant wide latitude for a misunderstanding of the rules; however, Ryan Bundy was cautioned during his *Faretta* canvass that, in order to be allowed him to represent himself, he would be required to follow the court's orders and rules. In addition, Bundy moved for and received an extension of time. Although the extension was shorter than the amount of time he requested, he simply filed his motions late without explanation. The court should therefore strike his motions as untimely.

### B. Ryan Bundy's Response

The Replies (ECF No. 1162, 1163) include Mr. Bundy's response to the government's motions to strike. Bundy asserts that the government filed untimely motions, which have been granted by the court. He claims he was denied due process, access to the courts, and the right to defend himself after his acquittal in the United States District Court for the District of Oregon because he was first transported from Oregon to Seattle, Washington, where he and his brother Ammon were kept for weeks without legal justification, and with no access to defense materials, family, or other support. Since arriving in Nevada, Bundy states he has been unable to obtain subpoenas for his defense or communicate with his "legal support team," including investigators, paralegals, and counsel (other than his court-appointed "standby counsel"). The court should therefore deny the motions to strike.

### C. Analysis and Decision on the Motion to Strike

Rule 12 addresses deadlines for filing pretrial motions and the consequences for filing a timely motion. If a party does not meet the deadline for filing a pretrial motion, "the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). "The decision whether to grant an exception to a Rule 12 waiver lies in the discretion of the district court." *United States v. Tekle*, 329 F.3d 1108, 1113 (9th Cir. 2003) (citing *United States v. Gonzales*, 749 F.2d 1329, 1336 (9th Cir. 1984)). A belated decision to change trial tactics does not constitute good cause to excuse the waiver. *Gonzales*, 749 F.2d at 1336; *see also United States v. Nunez*, 19 F.3d 719, 722–23 (1st Cir. 1994) ("something more than an unexplained change of mind must be shown to warrant relief from a Rule 12(f) waiver brought

on by the defendant's tactical decision"); *United States v. Kessee*, 992 F.2d 1001, 1002 (9th Cir. 1993) (finding no good cause when suppression motion was filed after trial started).

Pro se status "does not excuse a criminal defendant from complying with the procedural or substantive rules of the court." *United States v. Flewitt*, 874 F.2d 669, 675 (9th Cir. 1989) (citing *Faretta v. California*, 422 U.S. 806, 835 n.46 (1975)); *see also United States v. Hung Thien Ly*, 646 F.3d 1307, 1315–16 (11th Cir. 2011) (noting that "ignorance is no hidden virtue; a *pro se* defendant must follow the rules"). The Sixth Amendment guarantees a *pro se* defendant "a fair chance to present his case in his own way." *United States v. Rice*, 776 F.3d 1021, 1026 (9th Cir. 2015) (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984)). However, a "defendant who knowingly and intelligently assumes the risks of conducting his own defense is entitled to no greater rights than a litigant represented by counsel." *Flewitt*, 874 F.2d at 675 (citing *United States v. Merrill*, 746 F.2d 458, 465 (9th Cir. 1984)).

Ryan Bundy's Motions to Dismiss were not timely filed. However, he was in trial in Oregon for approximately 7 weeks before his acquittal on October 27, 2016, and he was not transported to this jurisdiction until mid-November. *See* Mot. for Order Compelling USM to Expedite Transfer (ECF No. 970); Nov. 15, 2016 Order (ECF No. 977) (denying motion as moot since defendants Ammon and Ryan Bundy had already arrived in Nevada). The court will therefore address the merits of the Motions to Dismiss, and deny the government's motions to strike.

## II.    RYAN BUNDY'S MOTIONS TO DISMISS

### A.  Legal Standard for Motion to Dismiss

Pursuant to Rule 12, a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Rule 12(b)(3) specifies the motions which must be made before trial. Among them are motions to dismiss for "charging the same offense in more than one count (multiplicity)" and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B). A pretrial motion to dismiss a criminal case is appropriate when it involves questions of law rather than fact. *United States v. Schulman*, 817 F.2d 1355, 1358 (9th Cir. 1987).

In ruling on a pretrial motion to dismiss, the district court is "bound by the four corners of the indictment." *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) ("On a motion to dismiss an indictment for failure to state an offense the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged."). The court should not consider evidence that does not appear on the face of the indictment. *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996)). Thus, a defendant is not entitled to a pre-trial evidentiary hearing to obtain a preview of the government's evidence and an opportunity to cross-examine its witnesses. *Id.* at 669 ("A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence.").

In determining whether a cognizable offense has been charged, the court does not consider whether the government can *prove* its case, only whether accepting the facts as alleged in the indictment as true, a crime has been alleged. *United States v. Milovanovic*, 678 F.3d 713, 717 (9th Cir. 2012). Rule 12 motions cannot be used to determine "general issues of guilt or innocence," which "helps ensure that the respective provinces of the judge and jury are respected." *Boren*, 278 F.3d at 914 (citation omitted). A defendant may not challenge a facially-sufficient indictment on the ground that the allegations are not supported by adequate evidence. *Jensen*, 93 F.3d at 669 (citation omitted). However, the court may dismiss an indictment if "it fails to recite an essential element of the charged offense." *United States v. Ezeta*, 752 F.3d 1182, 1184 (9th Cir. 2014) (citing *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005)).

**B. Charges Relevant to Mr. Bundy's Motions**

As relevant to his current motions, Ryan Bundy charged in the following counts:

- Count One – Conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- Count Three – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- Count Five – Assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Six – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Eight – Threatening a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Nine – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Eleven – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2. This charge arises from conduct that allegedly occurred on April 9, 2014.

- Count Thirteen – Interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and § 2. This charge arises from conduct that allegedly occurred between April 2, 2014, and April 9, 2014.

- Count Fourteen – Interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Fifteen – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

Ryan Bundy contends that Counts Three, Six, Nine, Thirteen, Fourteen, and Fifteen should be dismissed for an insufficient nexus with interstate commerce, and Counts One, Five, Six, Eight, Nine, Eleven, Thirteen, Fourteen, and Fifteen should be dismissed because they are multiplicitous.

### C. The Motion to Dismiss Re Insufficient Interstate Commerce Nexus

Ryan Bundy's Motion (ECF No. 1030) alleges that Counts Three, Six, Nine, Thirteen, Fourteen, and Fifteen do not state a sufficient nexus with interstate commerce to invoke federal jurisdiction. Mr. Bundy asserts that the drafters of the Constitution did not intend the term "commerce" in the Commerce Clause to include manufacturing or agriculture, and only intended "interstate commerce" to apply to the actual trade of goods across state lines. Federal authorities collecting and impounding cattle pursuant to a court order did not amount to "commerce" or "commercial transactions" under those terms' plain meaning and common sense construction. Thus, any obstruction of such activities could not interfere with interstate commerce.

Bundy also contends that the legislative history of the Hobbs Act, 18 U.S.C. § 1951, shows that Congress enacted the legislation in 1934 to eliminate racketeering by organized crime syndicates. However, defendants "are hardly organized professional gangsters" as some came to Nevada in April 2014 for only a few hours to protest against the government. Mot. (ECF No. 1030) at 7. Therefore, Counts Thirteen and Fourteen must be dismissed. Additionally, the motion argues that no person can be convicted of an offense under 18 U.S.C. § 924(c) for possessing, carrying,

or brandishing a firearm that did not affect interstate commerce. The superseding indictment fails to allege that firearms crossed state lines, thus, Counts Three, Six, Nine, and Fifteen must be dismissed.

In its Response (ECF No. 1129), the government asserts the superseding indictment sufficiently alleges offenses. Supreme Court precedent has affirmed Congress' authority to regulate activities that comprise an economic "class of activities" that have a substantial effect on interstate commerce, even if such activities are purely local. The government contends that the language of the Hobbs Act is unmistakably broad and Congress meant for the Hobbs Act to reach far as the Commerce Clause allows; thus, the government only needs show a *de minimis* effect on interstate commerce. The government is not required to show that the conduct at issue *actually* impacted interstate commerce, only a realistic probability of an effect on commerce or that the class of acts had an impact.

The government argues that Count Thirteen states a sufficient nexus to interstate commerce because it alleges that defendants "attempted to obtain impounded cattle in the care, custody, and possession of a contract auctioneer in Utah, with his or her consent having been induced by wrongful use of force, violence, and fear, including fear of economic loss." *Id*. ¶ 180; *see also id*. ¶¶ 40–45, 80, 105. Ryan Bundy is alleged to have extorted the auctioneer in an attempt to prevent him from engaging in a transaction whereby the cattle would be moved across state lines from Nevada and sold in Utah. Resp. (ECF No. 1129) at 9. Thus, his conduct is specifically alleged to have obstructed an interstate transaction by threats and intimidation. Courts have held that robbery or extortion of a business that generally engages in interstate commerce may constitute a Hobbs Act violation, even where interstate commercial transactions are not directly involved in the charged conduct. The superseding indictment alleges that the auctioneer was a business engaged in interstate commerce because the cattle were inventory that would be supplied for sale from out of state.

With regard to Count Fourteen, Ryan Bundy and his co-defendants are "alleged to have extorted the release of approximately 400 cattle that had been impounded by federal law enforcement officers and were intended to be transported across state lines to Utah and sold at

1   auction there." *Id*. at 11.  Counts Thirteen and Fourteen are complimentary and show that the

2   BLM's efforts to impound the cattle were intended to facilitate the auctioneer's sale of the cattle

3   in Utah.  Thus, Counts Thirteen and Fourteen establish a nexus to interstate commerce.

4          Additionally, the government asserts that Counts Three, Six, Nine, and Fifteen, which

5   allege violations of § 924(c), state a sufficient nexus to interstate commerce.  The government

6   argues that the requirement that a gun be used or carried in relation to a predicate federal offense

7   ensures that § 924(c) violations sufficiently affect interstate commerce and are sufficient to support

8   a § 924(c) challenge under the Commerce Clause.  Section 924(c) does not require the government

9   to prove that the firearm in question crossed states lines, and the case law interpreting § 924(c)

10  does not impose such a requirement.  For these reasons, the motion should be denied.

11         In his Reply (ECF No. 1163), Mr. Bundy contends that the facts alleged in the superseding

12  indictment arose solely in the context of *intrastate* commerce.  *Id*. at 2.  He maintains that the

13  "substantial effects doctrine" prevents Congress from reaching intrastate non-economic activity

14  even if it substantially affects a broader regulatory scheme.  He argues that the Hobbs Act does

15  not authorize the government to "seize (or 'impound') goods such as cows in inventory (or

16  grazing), force such goods into commerce, and then punish Americans for opposing such a

17  seizure."  *Id*. (citing *National Federation of Independent Business v. Sebelius*, 567 U.S. ___

18  (2012)).  Although the grazing cattle were not in commerce, the government seeks to get around

19  this problem by asserting that the BLM's impoundment efforts were intended to facilitate the

20  auctioneer's sale of the cattle in Utah.  However, no court order "authorized a 'sale of cattle' to

21  any 'auctioneer in Utah'."  *Id*.  Thus, the BLM was not "operating in any stream of commerce."

22  Because the underlying facts involve solely intrastate actions, defendants could not have interfered

23  with interstate commerce by opposing the government's impoundment efforts and the Hobbs Act

24  charges should be dismissed.

25         Mr. Bundy also argues that the alleged threats do not satisfy the Hobbs Act interstate

26  commerce element.  *Id*. at 3, citing among other cases, *United States v. Buffey*, 899 F.2d 1402 (4th

27  Cir. 1990) (reversing defendant's conviction for extorting a businessman for $20,000 to keep a

28  sexual encounter private)).  He maintains the court lacks jurisdiction and Counts Three, Six, Nine,

Thirteen, Fourteen, and Fifteen must be dismissed.

### D.  The Offenses Charged in the Superseding Indictment Sufficiently Allege a Nexus to Interstate Commerce

The Hobbs Act prohibits any robbery or extortion, or attempt or conspiracy to rob or extort, that "*in any way or degree* obstructs, delays or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a) (emphasis added).  The Supreme Court and the Ninth Circuit have repeatedly recognized the broad scope of the Hobbs Act.  *See, e.g., Taylor v. United States*, --- U.S. ----, 136 S. Ct. 2074, 2081 (2016); *Stirone v. United States*, 361 U.S. 212, 215 (1960); *United States v. Lynch*, 437 F.3d 902, 908 (9th Cir. 2006) (en banc).

The Hobbs Act defines "commerce" as:

> commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951(b)(3); *see also United States v. Rodriguez*, 360 F.3d 949, 954 (9th Cir. 2004) (noting that the Hobbs Act's "definition of commerce is well established").  Under this statutory definition of commerce, the Supreme Court has interpreted jurisdiction under the Hobbs Act to be coextensive with the Commerce Clause. *Stirone*, 361 U.S. at 215.  Thus, an inquiry into the reach of the Hobbs Act is "the same as an inquiry into the limits imposed on Congress by the Commerce Clause."  *Id.*; *see also Rodriguez*, 360 F.3d at 954 ("Congress meant for the Hobbs Act to reach as far as the Commerce Clause of the United States Constitution would allow.") (citation omitted).

The Supreme Court has identified three categories of activity that Congress may regulate under the Commerce Clause: (1) the use of the channels of interstate or foreign commerce; (2) the instrumentalities of interstate commerce and persons or things in commerce, which may include intrastate activities; and (3) activities that substantially affect interstate commerce and are economic in nature.  *Taylor*, 136 S. Ct. at 2079 (quoting *United States v. Lopez*, 514 U.S. 549, 558–559 (1995)); *see also Gonzales v. Raich*, 545 U.S. 1, 16 (2005); *United States v. Morrison*, 529 U.S. 598, 613 (2000).

Activities that "substantially affect" commerce "may be regulated so long as they

substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal." *Taylor*, 136 S. Ct. at 2079–80 (citing *Wickard v. Filburn*, 317 U.S. 111, 125 (1942); *Gonzales*, 545 U.S. at 17 (precedent "firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce") (citation omitted). Thus, the commerce element of the Hobbs Act is satisfied when the Commerce Clause authorizes Congressional regulation of the commercial activity that the defendants wrongfully affected. *Taylor*, 136 S. Ct. at 2081 ("As long as Congress may regulate the purely intrastate possession and sale of illegal drugs, Congress may criminalize the theft or attempted theft of those same drugs.")

 "To establish the interstate commerce element of a Hobbs Act charge, the government need only establish that a defendant's acts had a *de minimis* effect on interstate commerce," and the effect need only be probable or potential, not actual. *Lynch*, 437 F.3d at 908–09. Thus, the government is not required to show that a defendant's acts actually affected interstate commerce. *Id*. at 909 (citing *United States v. Huynh*, 60 F.3d 1386, 1389–90 (9th Cir. 1995)); *United States v. Bellamy*, 521 F. App'x 590, 592 (9th Cir. 2013) ("There is no requirement that a Hobbs Act indictment allege specific facts establishing an impact on interstate commerce.") (citing *United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995) (indictment that set forth elements of Hobbs Act was sufficient even though it "contained no facts alleging how interstate commerce was interfered with, and did not state any theory of interstate impact"). The interstate nexus may arise from either direct or indirect effects on interstate commerce. *Lynch*, 437 F.3d at 909–10. When a Hobbs offense is committed against an "interstate business," that "typically constitutes sufficient evidence to satisfy the Hobbs Act's interstate commerce element." *Rodriguez*, 360 F.3d at 955 (9th Cir. 2004) (citing *United States v. Collins*, 40 F.3d 95, 99 (5th Cir. 1994)); *see also United States v. Boyd*, 480 F.3d 1178, 1179 (9th Cir. 2007). (upholding Hobbs Act conviction for robbery of check cashing business that regularly engaged in interstate wire transactions).

The Supreme Court has cautioned that the de minimis standard is not intended as a means for the federal government "to pile inference upon inference" in a manner that would convert Congress' Commerce Clause authority into "a general police power of the sort retained by the

1  States." *Rodriguez*, 360 F.3d at 956 (quoting *Lopez*, 514 U.S. at 567). Although Congress'

2  authority under the Commerce Clause has "expanded with the growth of the national economy,"

3  case law has " 'always recognized that the power to regulate commerce, though broad indeed, has

4  limits'." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2589 (2012) (quoting *Maryland*

5  *v. Wirtz*, 392 U.S. 183, 196 (1968)). Taking those limits into consideration; however, Hobbs Act

6  convictions have consistently been upheld "even where the connection to interstate commerce was

7  slight." *Lynch*, 437 F.3d at 909 (collecting cases).

8        Additionally, the Ninth Circuit has upheld 18 U.S.C. § 924(c) against Commerce Clause

9  challenges finding that the requirement that a gun be used or carried in relation to a predicate

10  federal offense ensures that § 924(c) violations sufficiently affect interstate commerce. *See, e.g.*,

11  *Lynch*, 437 F.3d at 912 (citing *United States v. Staples*, 85 F.3d 461 (9th Cir. 1996)). Section

12  924(c)(1) criminalizes the use or carrying of a firearm "in relation to any crime of violence or drug

13  trafficking crime." 18 U.S.C. § 924(c)(1). The *Staples* court found that Congress did not exceed

14  its authority under the Commerce Clause in enacting § 924(c)(1) because a conviction under that

15  section is premised on an underlying felony offense, which is "conduct that substantially affected

16  commerce." 85 F.3d at 463; *see also United States v. Tisor*, 96 F.3d 370, 375 (9th Cir. 1996)

17  (explaining that intrastate drug activities are tied to interstate commerce, as "Congress expressly

18  found that intrastate drug trafficking had a 'substantial effect' on interstate commerce").

19        Here, the court finds that the superseding indictment satisfies the commerce and interstate

20  elements to state a colorable Hobbs Act offense. Ryan Bundy asks the court to dismiss particular

21  counts of the superseding indictment because "grazing cows" are not commerce for which

22  Congress may the exercise regulatory authority through the Hobbs Act. However, Congress has

23  authority under the Commerce Clause to regulate the market for commodities, which includes

24  livestock such as cattle. *See, e.g.*, *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465,

25  475 n.11 (1997) (noting that Congress included "livestock and livestock products" in the

26  Commodity Exchange Act in 1968); *Gonzales*, 545 U.S. at 19 (finding that the Controlled

27  Substances Act fell "squarely within Congress' commerce power" because production of a

28  commodity, "be it wheat or marijuana, has a substantial effect on supply and demand in the

national market for that commodity"). The government does not need to show that the trespass cattle either traveled or were destined for transport across state lines to convict defendants of Hobbs Act extortion. *See Taylor*, 136 S. Ct. at 2081. Rather, to satisfy the Hobbs Act's commerce element, it is enough that the superseding indictment alleges defendants knowingly committed extortion because, as a matter of law, the market for cattle is "commerce over which the United States has jurisdiction." *Id.* Thus, even if the cattle did not cross state lines, *i.e.*, remaining *intrastate*, Congressional authority to regulate commodities such as cattle is not exceeded. The superseding indictment's allegations satisfy the commerce element.

The reasoning in *Gonzalez* also demonstrates the flaws in Ryan Bundy's arguments regarding Congress' commerce power. Although the Supreme Court has struck down "a particular statute or provision that fell outside Congress' commerce power in its entirety," it has rejected arguments that "individual applications" of the commerce power were overbroad when the statutory scheme was valid. *Gonzalez*, 545 U.S. at 23 (contrasting the decisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000)). Applying this logic, Mr. Bundy's argument fails because he argues that Congress lacks power to enact legislation that affects these "grazing cows" in particular. An attack on commerce power pursuant to *Lopez* and *Morrison* would challenge a specific statute or provision regulating *all* livestock.

Furthermore, the government is not circumventing the commerce element by alleging facts about the BLM's impoundment operation and the auctioneer's involvement. In *National Federation of Independent Business*, the Supreme Court found that the "individual mandate" of the Patient Protection and Affordable Care Act was not within Congress' commerce power because the Act did not "regulate existing commercial activity." 132 S. Ct. at 2587. Instead, it compelled "individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." *Id.* This holding does not support Ryan Bundy's argument. Nothing in the record supports the argument that the government compelled the defendants to become active in commerce. Papers filed by counsel for Cliven Bundy in this case assert that he and his family have been ranching, raising, and grazing cattle since the 1800s. The superseding indictment does not need to allege, and the government does not need to prove, that the BLM was

operating in any stream of commerce. As explained, Congress has authority to regulate commodities under the Commerce Clause and livestock, including cattle are commodities. No one has disputed that Cliven Bundy was engaged in the production of cattle a commercial activity before the events of March and April 2014.

Additionally, defendants are not charged with making threats under the Hobbs Act. The Superseding Indictment (ECF No. 27) alleges extortion by force under the Hobbs Act. *Id*. ¶¶ 179–82. Thus, the court does not examine whether a threat satisfies the interstate commerce element of the Hobbs Act. The interstate commerce element is satisfied here because the superseding indictment alleges that the auctioneer was an "interstate business." *See Rodriguez*, 360 F.3d at 955.

Mr. Bundy's remaining arguments are similarly without merit. The Ninth Circuit has expressly held that Congress' enactment of 18 U.S.C. § 924(c) was within the scope of the Commerce Clause because the requirement that a gun be used or carried in relation to a predicate federal offense ensures that § 924(c) violations sufficiently affect interstate commerce. *See Lynch*, 437 F.3d at 912 (citing *Staples*, 85 F.3d at 462–63). To convict under § 924(c), the government must prove that a defendant: (1) committed a predicate crime, and (2) knowingly used, carried, or brandished a firearm during and in relation to the predicate crime. *See, e.g.*, 9th Cir. Model Jury Instructions, 8.71 "Firearms—Using or Carrying in Commission of Crime of Violence or Drug Trafficking Crime" (2010 ed.) (approved Apr. 2014). The government is not required to prove that the alleged firearm crossed any state lines for a § 924(c) offense. Although certain firearms offenses require the government to prove that a firearm has been shipped or transported in interstate commerce, *see, e.g.*, *United States v. Hartz*, 458 F.3d 1011, 1024 (9th Cir. 2006) (discussing 18 U.S.C. § 922(g)(1)), that is not required for a § 924(c) offense. Therefore, the absence of such allegation does render the superseding indictment defective.

Accordingly, the court will recommend denial of Ryan Bundy's Motion to Dismiss regarding a nexus to interstate commerce.

**E. The Motion to Dismiss Regarding Multiplicity**

Ryan Bundy's Motion (ECF No. 1031) alleges that Counts One, Five, Six, Eight, Nine, Eleven, Thirteen, Fourteen, and Fifteen are multiplicitous and cumulative, and therefore violate

the Fifth Amendment's prohibition against double jeopardy. The superseding indictment alleges that defendants conspired to thwart the government's efforts to round up hundreds of cows by threats of violence. *Id.* at 3. Counts Two, Five, Eight, Thirteen, and Fourteen duplicate the same factual allegations and basic elements, that defendants: (1) worked with others to (2) threaten or intimidate (3) federal officers away from (4) the performance of the officers' duties to round up or impound cattle. *Id.* at 3–6.[3] Counts Six, Nine, and Fifteen (use and carry of a firearm in relation to a crime of violence, 18 U.S.C. § 924(c) and § 2) also allege the same basic elements, but add gun brandishing elements. *Id.* at 6. Count Eleven (obstruction of the due administration of justice, 18 U.S.C. § 1503 and § 2) is multiplicitous of Count Four (assault on a federal officer, 18 U.S.C. § 111(a)(1), (b) and § 2). Finally, Count One (Conspiracy to Commit an Offense Against the United States, 18 U.S.C. § 371) is an amalgamation of all the disputed counts. Ryan Bundy argues it is significant that the government has invoked statutes aimed at disruptions of commercial activity as well as governmental activity, alleging that the same acts constitute disruptions of commerce and judicial process. Mot. at 11–12. "This odd melding of judicial process and commerce theories provides a dangerous source of multiplicity." *Id.*

Bundy contends that the government has picked out minor distinctions of wording among the charging statutes to show that each requires a proof of fact that the other does not. He asserts that the court must examine the allegations "in their essence; not in the way the statutes parcel out language." Reply (ECF No. 1162) at 2. The government cannot mask allegations as separate inchoate offenses to wipe away the problem of multiple counts charging essentially identical offenses. Because multiple counts in the superseding indictment lay out identical or virtually identical offenses, such counts must be dismissed as violations of the Double Jeopardy Clause.

In its Response (ECF No. 1127), the government argues that Ryan Bundy's motion should

_____

[3] Counts Two Five, Eight, and Fourteen allege the following: Count Two (conspiracy to impede or injure a federal officer, 18 U.S.C. § 372), Count Five (assault on a federal officer, 18 U.S.C. § 111(a)(1), (b) and § 2), Count Eight (threatening a federal law enforcement officer, 18 U.S.C. § 115(a)(1)(B) and § 2), and Count Fourteen (interference with interstate commerce by extortion, 18 U.S.C. § 1951 and § 2). The motion claims that Count Thirteen alleges obstruction of the due administration of justice, in violation of 18 U.S.C. § 1503 and § 2. *See* Mot. (ECF No. 1031) at 4–5. However, the Count Thirteen actually alleges interference with interstate commerce by extortion, in violation of 18 U.S.C. § 1951 and § 2. *See* Superseding Indictment (ECF No. 27) at 50–51, ¶¶ 179–80.

be denied because prosecution under different statutes with different elements for the same course of conduct is not multiplicitous.  The government notes that the Supreme Court devised a test in *Blockburger v. United States*, 284 U.S. 299 (1932), to determine whether two statutory provisions prohibit the same offense: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304.  Here, the government asserts that each of the criminal offenses Bundy challenges has different elements:

- Assault on a federal officer (U.S.C. § 111(a), (b)): (1) the defendant forcibly assaulted a federal officer or employee; (2) the defendant did so while the federal officer or employee was engaged in, or on account of his or her official duties; and (3) the defendant used a deadly or dangerous weapon.  *See* 9th Cir. Model Crim. Jury Instruction 8.4.

- Threat against a federal law enforcement officer (18 U.S.C. § 115(a)(1)(B)): (1) the defendant threatened to assault, kidnap, or murder a federal law enforcement officer; (2) the defendant made the threat with the intent to impede, intimidate, interfere with, or retaliate against that officer; (3) the defendant made the threat while the officer was engaged in or on account of the performance of his official duties; and (4) the defendant purposefully or knowingly intended to threaten the federal law enforcement officer.

- Obstruction of the administration of justice (18 U.S.C. § 1503): (1) the defendant influenced, obstructed, or impeded, or tried to influence, obstruct, or impede the due administration of justice; and (2) the defendant acted corruptly, or by threats or force, or by any threatening communication, with the intent to obstruct justice.  *See* 9th Cir. Model Crim. Jury Instruction 8.131.

- Hobbs Act Extortion (18 U.S.C. § 1951): (1) The defendant induced another to part with property by the wrongful use of actual or threatened force, violence, or fear; (2) the defendant acted with the intent to obtain property; (3) commerce from one state to another was or would have been affected in some way.  *See* 9th Cir. Model Crim. Jury Instruction 8.142.

- Conspiracy to Impede a Federal Officer (18 U.S.C. § 372): (1) the defendant agreed with

at least one other person to do one of the following: (a) to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties of such office; (b) to induce, by force, intimidation, or threat, any officer of the United States to leave the place where his duties as an officer are required to be performed; (c) to injure an officer of the United States, or his property, on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge of his duties; or (d) to injure the property of an officer of the United States so as to molest, interrupt, hinder, or impede him in the discharge of his official duties; and (2) the defendant knew of the agreement and willfully participated in the agreement.

The government contends that the elements of the charged offenses vary widely and each requires an element that the others do not. Mr. Bundy does not allege otherwise. The government states that a substantial overlap in evidence used to prove two offenses does not show multiplicity, as longs as the offenses involve different statutory elements.

Additionally, the government argues that prosecution for conspiracy to commit an offense and the substantive offense is not multiplicitous because a conspiracy and the completed offense are separate crimes. Conspiracy is an inchoate offense, which is in essence an agreement to commit an unlawful act. Resp. (ECF No. 1127) at 9 (collecting cases). Thus, separate sentences can be imposed for a conspiracy to commit a criminal act and the subsequent accomplishment of that criminal act. Likewise, a defendant can violate two conspiracy statutes with the same course of conduct. Therefore, a conviction under the general conspiracy statute, 18 U.S.C. § 371, and a specific conspiracy statute, such as 18 U.S.C. § 372, does not violate the Double Jeopardy Clause as long as the conspiracy crimes have different elements. The separate offenses show that Congress intended separate punishments.

The government also contends that prosecution for multiple counts of § 924(c) is not multiplicitous so long as each § 924(c) count is supported by a separate predicate offense. If each predicate offense satisfies the *Blockburger* test, then each predicate offense may form the basis of a § 924(c) count. Because the counts alleging violations of §§ 111, 115, 372, 1503, and 1951 are

1   not multiplicitous of one another, the § 924(c) counts are not multiplicitous.  Thus, the court should

2   deny Ryan Bundy's motion.

3   **F.  The Superseding Indictment is not Multiplicitous**

4       The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be

5   subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. Amend. V.

6   The Double Jeopardy Clause protects criminal defendants against both successive punishments

7   and prosecutions for the same criminal offense.  *United States v. Dixon*, 509 U.S. 688, 696 (1993)

8   (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969)); *see also United States v. Davenport*, 519

9   F.3d 940, 943 (9th Cir. 2008).  "An indictment is multiplicitous when it charges multiple counts

10  for a single offense, thereby resulting in two penalties for one crime and raising double jeopardy

11  concerns."  *United States v Mancuso*, 718 F.3d 780, 791 (9th Cir. 2013); *Davenport*, 519 F.3d at

12  943 (when two different criminal statutes are violated, "the double jeopardy prohibition is

13  implicated when both statutes prohibit the same offense or when one offense is a lesser included

14  offense of the other") (citing *Rutledge v. United States*, 517 U.S. 292, 297 (1996)).

15      The double jeopardy bar applies only where the defendant is punished or tried for two

16  offenses that fail a "same-elements" test set forth in *Blockburger v. United States*, 284 U.S. 299

17  (1932).  Where the "same act or transaction constitutes a violation of two distinct statutory

18  provisions," the Supreme Court instructed courts to examine "whether each provision requires

19  proof of an additional fact which the other does not" to determine if a defendant has been charged

20  with multiplicitous counts.  *Id.* at 304.  "The *Blockburger* test focuses on the statutory elements of

21  each offense, not the actual evidence presented at trial."  *United States v. Kimbrew*, 406 F.3d 1149,

22  1151–52 (9th Cir. 2005) (citing *Illinois v. Vitale*, 447 U.S. 410, 416 (1980)).  If each statute

23  "requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding

24  a substantial overlap in the proof offered to establish the crimes."  *United States v. Wahchumwah*,

25  710 F.3d 862, 869 (9th Cir. 2013) (quoting *Albernaz v. United States*, 450 U.S. 333, 338 (1981)).

26      The Ninth Circuit has held that a defendant may be convicted and sentenced for multiple

27  violations of § 924(c) so long as each § 924(c) count is supported by a separate predicate offense.

28  *United States v. Beltran-Moreno*, 556 F.3d 913, 916–17 (9th Cir. 2009) (collecting cases).  Thus,

if each predicate offense would be independent under the *Blockburger* test, then each predicate offense may form the basis of a § 924(c) count. *United States v. Castaneda*, 9 F.3d 761, 765 (9th Cir. 1993) ("[I]f the elements of the two predicate offenses are different, each may form the basis of a firearm count notwithstanding that both offenses stem from the same set of facts.").

Here, the court finds that Counts One, Five, Eight Six, Nine, Eleven, Thirteen, Fourteen, and Fifteen are not multiplicitous. Each offense requires proof of a unique element that the other offenses do not. *See Albernaz*, 450 U.S. at 338. For example, to prove forcible assault on a federal officer under § 111(b), the government must prove that defendants forcibly assaulted a federal officer. *See* 9th Cir. Model Crim. Jury Instruction 8.4 (approved Dec. 2015). No other offense requires proof of this fact. To convict under § 115(a)(1)(B), the government must prove that a defendant made a threat against a federal law enforcement officer, United States official or judge. No other offense requires proof of this fact. To convict under § 1503, the government must prove that a defendant influenced, obstructed, or impeded, or tried to influence, obstruct, or impede the due administration of justice. *See* 9th Cir. Model Crim. Jury Instruction 8.131 (approved Sept. 2015). No other offense requires proof of this element. To prove the extortion by force under § 1951, the government must prove that defendants obtained something of value from another with his consent induced by the wrongful use of force, fear, or threats. *See* 9th Cir. Model Crim. Jury Instruction 8.142 (approved June 2014). No other offense requires proof of this fact. Although terms such as "assault," "threats," "obstruction," and "extortion" may appear similar, they are legally distinct concepts with specific definitions. The court's review of the elements reveals that the *Blockburger* test is satisfied.

Certain offenses are charged multiple times in the superseding indictment: Counts Four and Five – assault on a federal officer (18 U.S.C. § 11(a)(1), (b)), Counts Seven and Eight – threatening a federal law enforcement officer (18 U.S.C. § 115(a)(l)(B)), Counts Ten, Eleven, and Twelve – obstruction of the due administration of justice (18 U.S.C. § 1503), and Fourteen and Fifteen – interference with interstate commerce by extortion (18 U.S.C. § 1951). However, these counts are not multiplicitous simply because they involve multiple counts under a common statute. Each count alleges distinct conduct on different dates. Some counts charge all 19 defendants and

others charge only a few defendants. Thus, each of these counts charge for discrete wrongful acts. They are not "multiple counts for a single offense" and will not result "in two penalties for one crime." *See Mancuso*, 718 F.3d at 791.

Established precedent also demonstrates that separate punishments can be imposed for a conspiracy to commit a crime as well as the crime itself. *Iannelli v. United States*, 420 U.S. 770, 777–79 (1975); *Pinkerton v. United States*, 328 U.S. 640 (1946); *United States v. Huber*, 772 F.2d 585, 591 (9th Cir. 1985) ("The double jeopardy clause does not prohibit prosecution for both conspiracy and a substantive offense based upon the same conduct."). To prove a conspiracy under § 371 as charged in Count One, the government must prove there was an agreement between two or more persons to commit "an offense against the United States," *i.e.*, the object of the conspiracy. *See* 9th Cir. Model Crim. Jury Instruction 8.20 (approved Dec. 2016). The government must specify the "offense against the United States" in the charging document. The superseding indictment alleges that such offenses were: (1) assault on a federal officer (18 U.S.C. § 11(a)(1), (b)); (2) threatening a federal law enforcement officer (18 U.S.C. § 115(a)(l)(B)); (3) use and carry of a firearm in relation to a crime of violence (18 U.S.C. § 924(c)); (4) obstruction of the due administration of justice (18 U.S.C. § 1503); (e) interference with interstate commerce by extortion (18 U.S.C. § 1951); and (5) interstate travel in aid of extortion (18 U.S.C. § 1952). *See* Superseding Indictment (ECF No. 27) ¶ 154–56. These federal offenses operate as the objects of the alleged § 371 conspiracy and are incorporated as an element of Count One's § 371 offense. *United States v. Arlt*, 252 F.3d 1032, 1036–38 (9th Cir. 2001); *see also United States v. Alghazouli*, 517 F.3d 1179, 1189 (9th Cir. 2008) (holding that a jury must be instructed "on an element of the crime that is the object of the conspiracy").

To obtain a conviction on Count Two's conspiracy charge under § 372, the government must prove there was an agreement between two or more persons to accomplish the object of the conspiracy, to: (1) prevent, "by force, intimidation, or threat," any officer of the United States from discharging his official duties; or (2) induce, "by like means," any officer of the United States to leave the place where he is required to perform his official duties. *See* Report of Findings & Recommendation (ECF No. 1218) at 28–32 (discussing the elements of Count Two's § 372

  
1    conspiracy charge); Superseding Indictment (ECF No. 27) ¶ 157–58.  The objects of the alleged

2    § 371 conspiracy and the § 372 conspiracy do not overlap.  Thus, each conspiracy charge requires

3    proof of a fact that the other does not.  The conspiracy charges are therefore independent, not

4    multiplicitous for double jeopardy purposes.

5         Additionally, because the underlying predicate offenses are independent under the

6    *Blockburger* test, each may properly form the basis of a separate § 924(c) offense.  *See Beltran-*

7    *Moreno*, 556 F.3d at 916.  Because the counts alleging violations of §§ 111, 115, 372, and 1951

8    are independent of one another, the § 924(c) counts are not multiplicitous.  Mr. Bundy has

9    therefore failed to demonstrate that the superseding indictment is multiplicitous.  Accordingly, the

10    court will recommend denial of Ryan Bundy's Motion to Dismiss regarding multiplicity.

11                       **CONCLUSION**

12         For the reasons explained,

13         **IT IS ORDERED:** the Government's Motions to Strike Ryan Bundy's Motions to Dismiss

14    (ECF No. 1127, 1129) is **DENIED**.

15         **IT IS RECOMMENDED:** Defendant Ryan C. Bundy's Motion to Dismiss on the

16    Grounds of Insufficient Nexus With Interstate Commerce (ECF No. 1030) and Motion to Dismiss

17    on Grounds of Multiplicity (ECF No. 1031) **be DENIED**.

18         Dated this 6th day of January, 2017.

19

20                                    PEGGY A. LEEN

21                                    UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28