**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 2:16-cr-00046-GMN-PAL |
| vs. | |
| RYAN BUNDY, | **ORDER** |
| Defendant. | |

This matter is before the Court on Defendant Ryan Bundy's Motion for Own Recognizance or Bail Pending Trial (ECF No. 1082), filed on December 8, 2016. The Government filed its Response (ECF No. 1157) on December 19, 2016 and Defendant filed his Reply (ECF No. 1184) on December 22, 2016. The Court conducted a hearing in this matter on December 23, 2016.

## BACKGROUND

Defendant Ryan Bundy was initially charged with four other defendants, including his father and brother, in a criminal indictment filed on February 17, 2016. (ECF No. 5) A superceding indictment, filed on March 2, 2016, added fourteen additional defendants. Defendant Ryan Bundy is charged with the following offenses: (1) conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371; (2) conspiracy to impede or injure a federal officer in violation of 18 U.S.C. § 372; (3) use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and 2; (4) assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b) and 2; (5) threatening a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B) and 2; (6) obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and 2; (7) interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and 2; and (8) interstate travel in aid of extortion, 18 U.S.C. § 1952 and 2. *Superceding Indictment* (ECF No. 27).

On the date the indictment was filed, Ryan Bundy was already in federal custody in the District of Oregon on charges arising from the alleged take-over of a national wildlife refuge area in January 2016. Defendant was transported to the District of Nevada for his initial appearance and arraignment on April 15, 2016. Mr. Bundy advised the Court that he wished to represent himself. The Court appointed counsel to represent him pending a *Faretta* hearing. Mr. Bundy declined to enter a plea and a not guilty plea was entered on his behalf. The Government moved to detain Mr. Bundy pending trial as a substantial risk of nonappearance and danger to the community. Defendant requested a continuance of the detention hearing so that he could be interviewed by Pretrial Services. The Court ordered that Defendant be temporarily detained and scheduled the detention hearing for April 20, 2016. *Minutes of Proceedings* (ECF No. 247). The Court conducted a *Faretta* hearing on April 19, 2016 and granted Ryan Bundy's request to represent himself. His court appointed attorney, Angela Dows, was appointed as standby counsel. *Minutes of Proceedings* (ECF No. 285).

On April 20, 2016, Mr. Bundy moved for a further continuance of the detention hearing, arguing that he was "in need of an evidentiary hearing. We have evidence that can be brought forth but is not here, cannot be had today." *Transcript of Detention Hearing* (ECF No. 1140), pgs. 4-5. He also stated that he had been incarcerated under lockdown status and had had little access to his "legal team." *Id.* The Court denied the request for a further continuance, but stated that if Defendant was detained, he could move to reopen the hearing if there was information that was not known to him at the time of the hearing and that had a material bearing on whether conditions of release could be fashioned. *Id.* at pg. 6. Government's counsel proceeded to make his proffer in support of detention. The Government noted that Mr. Bundy was charged with four counts of the use and carry of a firearm in relation to a crime of violence pursuant to 18 U.S.C. § 924(c), which give rise to a rebuttable presumption that Defendant poses a substantial risk of nonappearance and danger to the community. *Id.* at pg. 7. The Government based its proffer on the factual allegations set forth in the superceding indictment. *Id.* at pgs 7-16.[1]

---

[1] The superceding indictment alleges that in March 2014, federal officers undertook to enforce federal court orders issued in 1998, 1999, and 2013 that required Defendant Cliven Bundy to remove his trespassing cattle from the Lake Mead National Recreation Area and an area of federal public land known as the Bunkerville

2

Allotment. *Superceding Indictment* (ECF No. 27), ¶¶ 33-47. On March 14, 2014, the Bureau of Land Management ("BLM") formally notified Cliven Bundy that operations to remove his cattle from the public lands and impound them for sale would commence. Cliven Bundy threatened to interfere by stating that he was ready to do battle with the BLM and would do whatever it took to protect his property. ¶¶ 49-50. With respect to Defendant Ryan Bundy, the superceding indictment alleges that on March 17, 2016, he threatened to interfere with the impoundment; that he and his family would do whatever it takes; and he would have several hundred with him to prevent the BLM from removing the trespassing cattle. When asked if his use of "'whatever it takes'" included physical force or violence, Defendant Ryan Bundy stated "'I will do whatever it takes; you interpret that the way you want.'" ¶ 51.

The superceding indictment alleges that the Bundy Defendants recruited armed "gunmen," and other "Followers" to travel to the Bundy Ranch for purposes of interfering with the BLM's impoundment operations. ¶¶ 57-59. Defendants Ammon Bundy and Ryan Bundy "were leaders and organizers of the conspiracy who, among other things, recruited gunmen and other Followers; interfered with impoundment operations through threats and use of force and violence, interfered with impound operations by attempting to extort BLM contractors; led an armed assault against federal law enforcement officers; delivered extortionate demands to law enforcement officers; and extorted federal law enforcement officers." ¶ 61. On March 28, 2015, Ryan Bundy with others, blocked a convoy of vehicles carrying horses and equipment intended for use in the impoundment operations, and confronted and threatened civilian contractors, endangering the safety of the personnel in the convoy and interfering with impoundment operations. ¶ 78. On April 2, 2014 Ryan Bundy and others traveled to Utah to threaten force, violence and economic harm to a contract auctioneer who was providing services to the BLM in connection with the impoundment. ¶ 80. On April 5, 2014, Ryan Bundy publicly threatened to use force and violence against federal law enforcement officers to prevent removal of the cattle. ¶ 81. On April 6, 2014, Ryan Bundy and one of his brothers blocked a BLM convoy and refused to leave the area when asked to do so. ¶ 83. On April 9, 2014, Ryan Bundy again traveled to Utah to threaten force, violence and economic loss to the contract auctioneer who was providing services to the BLM. ¶ 105.

The superceding indictment alleges that by the morning of April 12, 2014, the BLM had seized approximately 400 head of cattle and had them corralled at an Impoundment Site, awaiting further shipment out of the state of Nevada. ¶¶ 123. On that date, Cliven Bundy led a rally of hundreds of his followers at a Staging Site located approximately 3.5 miles from the Impoundment Site, and directed gunmen and other followers to travel to the Impoundment Site, and to shutdown the freeway near the Impoundment Site. ¶ 125. Defendants Ammon Bundy and Mel Bundy led groups of gunmen and Followers to the Impoundment Site where armed gunmen and Followers confronted federal law enforcement officers. ¶¶ 128-131. The gunmen took up positions from which they trained firearms on the federal officers in the Impoundment Site. Because of the threat of armed violence posed by the gunmen, the federal officers were forced to give into the Defendants' demands and leave the Impoundment Site, abandoning the cattle to Defendant Cliven Bundy. ¶ 142.

The superceding indictment alleges that "[h]aving been forced to meet the conspirators' demands, the SAC [Special Agent in Charge] met with D. Bundy and [Ryan] Bundy near the main entrance to the Impoundment Site to negotiate the departure of the law enforcement officers. While the Followers, including gunmen, held their position below at the gate, [Ryan] Bundy demanded that the SAC order his officers to leave the Impoundment Site within two hours." ¶ 143. Ryan Bundy thereafter assumed a leadership role in ensuring that the officers left the Impoundment Site quickly and then organized the Followers to release the cattle. Ryan Bundy and others gathered the cattle and drove them out of the Impoundment Site. ¶¶ 144-145. The superceding indictment alleges that from April 12, 2014 until at least the end of May 2014, "the defendants established,

The Government also discussed Mr. Bundy's alleged involvement in the subsequent armed occupation of the national refuge area in Oregon. *Id.* at pgs. 16-17.

In response to the Government's proffer, Mr. Bundy argued that "there was no assault made" and that the proffer was "clear full of lies, untruths, statements attributing to me that were not made by me, acts that were attributed to me that were not made by me." *Id.* at pg. 18. Mr. Bundy further stated: "And we made no action of aggression at all. Our acts were simply in defense of our rights, both rights protected by state, protected by the Constitution of the United States, protected by water rights, protected by our grazing rights." *Id.* at pg. 18. Mr. Bundy reiterated that he had much evidence that he wanted to bring forth to demonstrate the falsity of the Government's allegations. *Id.* at pg. 19.

The Court found that the charges against Defendant pursuant to 18 U.S.C. § 924(c) gave rise to a rebuttable presumption that he poses a substantial risk of nonappearance and a danger to the community. The Court discussed the factual allegations contained in the Government's proffer and the superceding indictment showing the danger to the community posed by Mr. Bundy, as well as his unwillingness to comply with court orders. *Id.* at pgs. 20-22. The Court also discussed the allegations regarding Mr. Bundy's alleged involvement in the takeover of the national refuge area in Oregon. *Id.* at pgs. 22-23. The Court acknowledged that Mr. Bundy has family and community ties in the State of Nevada, as well as a history of employment. With respect to Defendant's family ties, however, the Court noted that Defendant is charged, along with other members of his family, with having conspired to and committing the armed assault on federal officers. The Court found that Defendant poses a substantial risk of nonappearance. It also found by clear and convincing evidence that he poses a substantial risk of danger to the community. The Court further found that there are no conditions or combination of conditions that can be fashioned to reasonably assure the Defendant's appearance or protect the community against the risk of danger posed by him. *Id.* at pgs. 24-25. The Court reiterated that Defendant was not foreclosed from filing a motion to reopen the detention hearing on the basis that he wished to present evidence that was not available to him at the time of the hearing. *Id.* at pg. 25.

---

organized, and maintained camps to provide housing and logistical support to armed gunmen who continued to travel to the Bundy Ranch." ¶ 147.

The written detention order also stated that it was entered without prejudice to Defendant's right to move to reopen the detention hearing. *Order* (ECF No. 298), pg. 2.

Following a court hearing on April 22, 2016, Mr. Bundy was transported back to the District of Oregon. He remained in custody in the District of Oregon through the conclusion of the criminal trial in that district. On October 27, 2016, Mr. Bundy was acquitted on two of three charges against him. The jury could not reach a verdict on the third charge of theft of government property. *United States v. Ryan Bundy*, District of Oregon Case No. 3:16-cr-00051-BR, Verdict (ECF No. 1511). Defendant Bundy was thereafter transferred to the District of Nevada and he is presently in custody and awaiting trial in this district.

The District Judge overruled Mr. Bundy's objection to the undersigned's detention order on December 7, 2016. *Order* (ECF No. 1078). On December 12, 2016, the Court entered an order separating the trials of the remaining seventeen defendants into three tiers and trials. Defendants Cliven Bundy, Ryan Bundy, Ammon Bundy, Peter Santilli and Ryan Payne are in Tier 1. The Court ordered that trial of the Defendants in Tier 3 shall proceed on February 6, 2017. Trial of the Defendants in Tier 1 shall proceed 30 days after conclusion of the trial of the Tier 3 Defendants. Order (ECF No. 1098). It therefore appears unlikely that Defendant Ryan Bundy's trial will begin prior to April 2017 and, depending on the duration of the first trial, may not commence until May 2017.

In his instant Motion for Own Recognizance or Bail Pending Trial (ECF No. 1082), Defendant Bundy asserts that there are new and substantially changed conditions since the last detention hearing on April 20, 2016; the most significant change being his and the other defendants' acquittals in the criminal case in the District of Oregon. *Id.* at pg. 1. Defendant goes on to argue against the underpinning of the Supreme Court's decision in *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095 (1987), which held that the Bail Reform Act, 18 U.S.C. §§ 3141, et seq., is not unconstitutional on its face. Id. at pgs. 3-8. Defendant further argues that his prolonged pretrial detention, ten months as of the filing of his motion,[2] violates his Fifth Amendment right to due process of law. *Id.* at pgs. 8-23.

---

[2] Plaintiff was temporarily detained by this Court on April 15, 2016, and then pursuant to the detention order entered on April 20, 2016. His detention prior to April 15, 2016 was based on the charges against him in the District of Oregon.

5

In his Reply (ECF No. 1184), Defendant Bundy argues that he is entitled to "a full evidentiary hearing" on the following issues:

1. "[T]o establish admissible evidence of the locus delicti of the alleged criminal acts which would establish the Vicinage of the crime and determine the proper court with general jurisdiction for the trial." *Id.* at pg. 3. (This issue apparently relates to the allegation that Defendant Bundy traveled from Nevada to Utah where he allegedly threatened a contract auctioneer who was assisting the BLM. It may also relate to the alleged offenses in the District of Oregon which were pending at the time of the detention hearing in April 2016, but upon which Defendant has since been acquitted.)

2. To determine if Defendant blocked or interfered with the BLM's contractors and/or if Ryan Bundy threatened any person at the auction in Utah.

3. To determine if the "private contractor(s)" were federal officers or qualify as "Public Law Enforcement" and jurisdictional issues relating to the same.

4. To determine if the government falsely alleged that a peaceful public protest qualified as an "assault" on federal officers.

Defendant Bundy argues that if the assault never happened, then the attorneys presenting the false charges should be sanctioned and that the Magistrate Judge's findings based on those false pleadings should be stricken. *Reply* (ECF No. 1184), pgs. 3-4.

Defendant Bundy states that he needs to subpoena the following witnesses for the evidentiary hearing: Deputy Sheriff Mark Quinn, Deputy Sheriff Thomas Roberts, and former Deputy Sheriff, now Sheriff, Joseph Lombardo. He states that each of these individuals were present during the "so called assault." Defendant also states that he has numerous other witnesses who will testify about the alleged assault or his contention that it was a peaceful public protest. *Id.* at pg. 4.

Defendant Bundy states as an offer of proof that during the alleged assault, he was sitting peacefully in Deputy Sheriff McQuinn's squad car exercising his Second Amendment right to carry personal protection. He states that the local Sheriff negotiated with the BLM for withdrawal of the government assets and release of the cattle and the Sheriff met with Cliven Bundy and announced that the BLM was going to withdraw. Defendant also alleges that Cliven Bundy was not at the scene of the alleged assault; that Defendant Ammon Bundy was not armed and was accompanied at the protest by

Deputy Sheriff Tom Roberts; that during the alleged assault, Ryan Bundy, Ammon Bundy and other public protesters cooperated with and had the full support of local law enforcement; and that the only violence committed during the entire period was by the BLM. In this regard, Defendant alleges that a BLM "thug" violently assaulted his 57 year old aunt. *Id.* at pgs. 4-5. Finally, Defendant Bundy challenges the authority of the Government to enforce a civil court order in the state of Nevada and outside the territory of the United States. *Id.* at pg. 6.

## DISCUSSION

### 1. **Defendant's Motion to Reopen the Detention Hearing.**

The Bail Reform Act provides that the detention hearing may be reopened at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community. 18 U.S.C. § 3142(f)(2). In considering Defendant Bundy's motion to be released from detention, the Court begins by discussing the grounds on which a defendant may be detained and the requirements for conducting a detention hearing.

§ 3142(f)(1) provides that upon motion by the Government, the judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in § 3142(c) will reasonably assure the appearance of the defendant and the safety of the community in certain types of cases, including a case that involves a crime of violence for which a maximum term of 10 years or more is prescribed (subsection (A)), or any felony that is not otherwise a crime of violence that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon (subsection (E)). § 3142(f)(2)(A) states that the judicial officer shall conduct a detention hearing upon motion of the Government or upon the judicial officer's own motion, in a case that involves a serious risk that such person will flee.

§ 3142(e)(3)(B) provides a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community if the judicial officer finds that there is probable cause to believe that the defendant committed an offence under 18 U.S.C. § 924(c).

§ 3142(f)(2) states that at the detention hearing, "[t]he person shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise.  The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation of and consideration of evidence at the hearing.  The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence."

§ 3142(g) states that in determining whether there are conditions of release that will reasonably assure the appearance of the defendant and the safety of any other person and the community, the court shall take into account (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, or involves a firearm, explosive, or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

In discussing the manner in which a detention hearing is conducted under § 3142(f)(2), the court in *United States v. Windsor*, 785 F.2d 755, 756 (9th Cir. 1986) stated:

> As in a preliminary hearing for probable cause, the government may proceed in a detention hearing by proffer or hearsay. *United States v. Cardenas*, 784 F.2d 937, 938 (9th Cir. 1986); *United States v. Delker*, 757 F.2d 1390, 1395-96 (3d Cir. 1985); *Acevedo-Ramos*, 755 F.2d at 206-07.  The accused has no right to cross-examine adverse witnesses who have not been called to testify. *Delker*, 757 F.2d at 1397-98.

The court noted that the magistrate judge allowed the government to proceed by way of proffer, and that "[w]ithout a proffer from [defendant] that the government's proffered information was incorrect, the magistrate judge was not required to allow him to cross-examine the investigators and police officers." *Id.* at 757.

In *United States v. Delker*, the Third Circuit also interpreted the requirements for conducting detention hearings under § 3142(f) and whether the detention hearing in that case comported with the

defendant's Fifth Amendment right to due process of law. The defendant was charged with violations of the RICO statute, 18 U.S.C. § 1862, and related offenses of accepting illegal payments from local union employees, extortion and Hobbs Act violations. These charges arose out of the defendant's alleged participation in a conspiracy whose members used violence, threats and physical and economic intimidation to control the union and extort money from contractors and union members. 757 F.2d at 1392. A magistrate ordered that defendant be released from custody subject to conditions of pretrial release. The government appealed to the district judge pursuant to § 3145(a)(1) and argued that defendant should be detained as both a risk of nonappearance and danger to the community. The district judge conducted an evidentiary hearing at which the government's evidence consisted primarily of the testimony an FBI agent and an agent of the Department of Labor who "recounted their investigation and included the out-of-court statements of several witnesses to, and victims of the alleged conspiracy." *Id.* at 1396. The district court refused to allow defendant to call witnesses to testify regarding his community ties. The court, however, accepted defendant's proffer of these witnesses' testimony as fully credible. *Id.* Defendant was permitted to cross-examine the two government agents regarding their testimony tying him to the crimes. The court, however, did not allow defendant "to subpoena the witnesses whose out-of-court statements linked [him] to the conspiracy and other crimes." *Id.* at 1397–98. The district judge ordered that the defendant be detained as a risk of danger to the community. *Id.* at 1396.

*Delker* held that the detention hearing complied with the requirements of § 3142(f) and with due process of law. The court noted that the legislative history regarding the procedural requirements for pretrial detention hearings under § 3142(f) were based on those of the District of Columbia statute which were held to meet constitutional due process requirements in *United States v. Edwards*, 430 A.2d 1321 (D.C. App. 1981) (en banc), *cert. denied*, 455 U.S. 1022 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). *Delker* noted that the District of Columbia statute contained similar language to that in § 3142(f). "Yet in *Edwards* the court held that the question whether to produce evidence by direct testimony or proffer was in the discretion of the court." 757 F.2d at 1395. As quoted in *Delker*, the *Edwards* court stated:

> [B]ail hearings under the [District of Columbia] Bail Reform Act, which
> frequently result in detention of the accused, proceed primarily by way of
> proffer. They are not formal trials requiring strict adherence to technical

> rules of evidence. *If the court is dissatisfied with the nature of the proffer, it can always, within its discretion, insist on direct testimony.* But discretion should be left to the court without imposing on it the burden of limiting admissibility to that it would permit a jury to hear. [H.R.Rep. No. 9`-907, 91st Cong., 2d Sess. 182, 184 (1970) (emphasis added).

*Id.* at 1395.

*Delker* then stated:

> Congress was aware of this interpretation of the District of Columbia statute and the practice that had evolved when it relied on that statute as a model for the Bail Reform Act of 1984. In light of this, and the fact that Congress warned that bail hearings should not become mini trials, *see e.g.,* S.Rep. No. 225, 98th Cong., 1st Sess. at 22 (1983), *reprinted in* 1984 U.S.Code Cong. & Ad.News at 25 (Supp. 9A), we believe that discretion lies with the district court to accept evidence by live testimony or proffer. *See United States v. Payden*, 598 F.Supp. 1388, 1398 n. 14 (S.D.N.Y. 1984).

*Id.* at 1395–96.

*Delker* further held that conducting a detention hearing by proffer, or by testimony of witnesses that includes hearsay, does not violate a defendant's Fifth Amendment right to due process of law. *Id.* at 1396–97. The court stated that defendant's due process rights were not violated by the refusal to permit him to subpoena the witnesses on whose statements the agents' hearing testimony was based. *Id.* at 1397–98. The court, however, did not reach "the issue whether a defendant may have a right to confront non-appearing government witnesses when the defendant can make a specific proffer to the court of how the witnesses' testimony will negate the government's contention that the defendant is a danger to the community, or will rebut the presumption created by the statute that the defendant should be detained. *See* BRA § 3142(e)." *Id.* at 1398 n. 4.

In *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996), the court rejected defendant's argument that the district court's decision to permit the government to proceed by proffer denied him procedural due process and his right under the Sixth Amendment to confront his accusers. The court, citing *Windsor*, *Delker* and other appellate decisions, stated that "[a] pretrial detention hearing is neither a discovery device for the defense nor a trial on the merits. The process that is due is only that which is required by and proportionate to the purpose of the proceeding. That purpose includes neither a reprise of all the evidence presented before the grand jury (citation omitted), nor the right to confront non-

10

testifying government witnesses."

In its response to Defendant Bundy's motion, the Government relies on the rebuttable presumption in § 3142(e)(3)(B) and the statement in *United States v. Ward*, 63 F.Supp.2d 1203, 1209 (C.D.Cal. 1999) that "[v]arious circuits have uniformly held that a judicial officer does not have to make an independent determination of probable cause and a grand jury indictment itself is sufficient to establish probable cause for purposes of invoking the Section 3142(e) presumption." *Id.* (citing *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991); *United States v. Dominguez*, 783 F.2d 702, 706 n. 7 (7th Cir. 1986); *United States v. Hurtado*, 779 F.2d 1467, 1479 (11th Cir. 1985), *reh'g denied*, 788 F.2d 1570, (11th Cir. 1986); *United States v. Contreras*, 776 F.2d 51, 52 (2d Cir. 1985); *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985); and *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986)). *Ward* further noted that § 3142(e) imposes a burden of production presumption, meaning that the defendant must come forward with some evidence to rebut the presumption that he poses a substantial risk of flight or danger to the community. If the defendant does so, the burden of persuasion still rests with the government. 63 F.Supp.2d at 1209 (citing *United States v. Jessup*, 757 F.2d 378, 383 (9th Cir. 1985)). The presumption of flight or danger does not disappear and it retains evidentiary weight. The precise weight to be given to the presumption is a matter that the court must consider within the framework of the factors set out in Section 3142(g). *Ward*, 63 F.Supp.2d at 1209; *Jessup*, 757F.2d at 387.

In *United States v. Hurtado*, 779 F.2d 1467 (11th Cir. 1985), the court stated once the government makes a showing of probable cause that triggers the presumption under § 3142(e), "it becomes the task of the defendant to come forward with evidence to meet his burden of production—that is evidence to suggest he is either not dangerous or not likely to flee if turned loose on bail." *Id.* at 1479. The defendant "enjoys wide latitude in securing information to rebut these presumptions." *Id.* The court stated that:

> The procedural tools provided are used only to effectuate the inquiry mandated by subsection (f): "whether any condition or combination of conditions set forth in subsection (c) will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ." The statute leaves for trial the defendant's opportunity to rebut the finding of probable cause. Thus, to the extent that a subpoena at the pretrial detention stage is merely an attempt to

       rehash the question of probable cause, the trial court may properly quash the subpoena.

*Id.* at 1479.

*Hurtado* stated that when the question is whether the defendant has successfully rebutted the presumption under § 3142(e), "the judicial officer is directed to the four-part catechism of subsection (g)." *Id.* Under § 3142(g)(2), the judicial officer may consider the "weight of the evidence against the person." The court stated that when this factor is pertinent to the detention decision:

> [I]t may well be necessary to open up the issue of probable cause since that too is a question of evidentiary weight. At that point, the defendant is guaranteed by subsection (f) the various rights noted above, including the right to cross-examine government witnesses whose testimony led to the evidentiary finding of probable cause. Though the judicial officer retains discretion in such hearings "to curtail cross-examination based upon such criterion [sic] as relevancy, or to prevent a pretrial hearing from becoming a full-blown trial," still "the court should always exercise that discretion with the recognition that a pretrial hearing may restrict for a significant time the liberty of a presumably innocent person." *Delker*, 757 F.2d at 1398.

*Id.* at 1479–80.

The *Hurtado* court held that the magistrate erred in refusing to permit the defendant to subpoena two DEA agents who would have allegedly testified that he was elsewhere at the time the crime was committed and that he had no contact with other actors in the alleged conspiracy. It found that the error was harmless, however, because the magistrate's "finding that there was a great likelihood of flight was based on the nature of the offense, factor (g)(1), and on the history and characteristics of the petitioners, factor (g)(3). These constitute adequate bases to support the conclusion he drew." *Id.*

In *United States v. Gavaria*, 828 F.2d 667, 669 (11th Cir. 1987), the court affirmed the magistrate's refusal to permit defendants to call the government's case agent who was present in court during the hearing. The court further stated that the judicial officer is vested with the discretion whether to allow the defendant to call an adverse witness with or without an initial proffer of the expected benefit of the witness's testimony. *Id.* at 670. In *United States v. Joost*, 42 F.3d 1384 (1st Cir. 1994) (unpublished disposition), the government's proffer of dangerousness was based on the affidavit of an FBI agent detailing the events giving rise to the charges against the defendant. The FBI agent, in turn, relied principally on statements provided to him by two state police detectives. In rejecting

12

defendant's argument that the magistrate judge erred in not permitting him to call the detectives as an adverse witnesses, the court cited *Hurtado, Gaviria* and *Windsor*. The court found that the proffer made by the defendant was insufficient to show that the detective's testimony would be relevant to the charges against the defendant. More recent district court decisions reiterate that a defendant does not have an unrestricted Sixth Amendment right to confront adverse witnesses who were not called by the government to testify at the hearing or to have the court conduct a mini-trial on the ultimate question of guilt. *United States v. Bibb*, 488 F.Supp.2d 925, 926 (N.D.Cal. 2007). *See also United States v. Hernandez*, 778 F.Supp.2d 1211, 1227 (D.N.M. 2011).

In this case, the Court's April 20, 2016 detention order was based on the charges in the superceding indictment as outlined in the Government's proffer, the rebuttable presumption under § 3142(e), and the information before the Court regarding Defendant Bundy's alleged participation in the armed take over of the national refuge area in Oregon. Defendant's prior criminal history showed that he had three arrests and/or misdemeanor convictions between 1994 and 2015 for obstructing police officers in Utah. Although these charges or convictions have some similarity to the charges in the superceding indictment, Defendant's prior criminal record, standing alone, would not support a finding that he poses a substantial risk of non-appearance or a danger to other persons or the community.

Defendant was born in 1972. He resided in Bunkerville, Nevada from 1972 until 1995, Cedar City Utah from 1995 until 2014, and Bunkerville, Nevada from 2014 until his arrest and detention in 2016. Defendant has been married since 1996 and has eight children. From 2014 until the time of his arrest, Defendant worked as ranch manager at the Bundy Ranch. Prior to that, he owned and operated a construction business in Cedar City, Utah. Defendant reported that his health is good. He has never consumed alcoholic beverages or abused any illegal controlled substances. Defendant's family ties, residential and employment history, and lack of any history of alcohol or controlled substance abuse generally support a finding that he does not pose a risk of nonappearance or a danger to the community, and that to the extent he does, conditions of pretrial release could be fashioned to address those risks.

In denying Defendant Bundy's request for another continuance of the detention hearing on April 20, 2016, the Court informed him that he could move to reopen the detention hearing. The Court reiterated that statement at the conclusion of the hearing and its written detention order. Given that

Defendant desired to challenge the factual basis for the charges against him, it is reasonable to conclude that he was not yet able to mount that challenge on April 20, 2016. Shortly thereafter, Defendant was transferred back to the District of Oregon where he remained until after the trial in October 2016. Defendant was in no position to move to reopen the detention hearing until after his transfer back to Nevada. The district judge also did not rule on Defendant's objection to the undersigned's detention order until December 7, 2016. The fact that Defendant was acquitted on two of the charges and the jury was unable to reach a verdict on the third charge in the District of Oregon case is a changed circumstance that, while not determinative, could have a bearing on the issue of detention. Defendant Bundy is therefore entitled to have the detention hearing reopened so that he may present evidence, by way of proffer or testimony, to refute the finding of probable cause for the charges against him in the superceding indictment. *See Hurtado, supra*, 779 F.2d at 1479–80.

There is, of course, a very legitimate concern that a reopened detention hearing not develop into a mini-trial on the ultimate issue of guilt or innocense. That concern is heightened in this case which involves various alleged events and conduct by numerous actors in addition to the seventeen defendants currently charged in the superceding indictment. The main incident charged in the superceding indictment, the April 12, 2014 confrontation at the Impoundment Site, involved hundreds of individuals who likely have different versions of what occurred depending on their points of view, both physical and mental. The Court understands that there is photographic and video evidence that may depict the alleged incidents differently, depending on when, where, what time, and by whom the photographs or video were taken or edited. All of this evidence, to the extent admissible, is a matter for presentation at the jury trial, and not at the detention hearing. This case has been separated into three tiers of defendants who will be tried separately. Each of the trials is expected to last several weeks and will probably require presentation of overlapping evidence. The first trial is scheduled to begin on February 6, 2017. The Government and the Defendants are no doubt heavily engaged in preparation for that trial. It is therefore also important that the reopened detention hearing, while protective of Defendant Bundy's right to present evidence to rebut the presumption under § 3142(e), does not unduly interfere with the parties' ability to prepare for the upcoming trials.

The Court will not entertain presentation of evidence regarding Defendant's arguments that the

Court or the United States does not have jurisdiction to try him on the charges in the indictment. These arguments do not appear to have any legal merit. To the extent they do, they should be presented by motion to the presiding judge. Nor will the Court permit Defendant to present testimony on the issue of whether "private contractors' were federal officers or qualify as "Public Law Enforcement." The Court does not read the superceding indictment as alleging that private contractors were federal officers or federal law enforcement officers. To the extent this is an issue in the case, it can also be raised by motion to the Court, and is not a matter for determination at the detention hearing.

Defendant Bundy may, if he so chooses, testify at the detention hearing, and be subject to cross-examination by the Government, or he may make a proffer of evidence to show that he did not commit the crimes charged in the superceding indictment. Defendant Bundy has previously indicated an intention to call numerous witnesses at the detention hearing. While the Court does not preclude Defendant from calling any witnesses to testify, it requires that he first make "a specific proffer to the court of how the witnesses' testimony will negate the government's contention that the defendant is a danger to the community, or will rebut the presumption created by the statute that the defendant should be detained." *Delker*, 757 F.2d at 1398 n. 4. This requirement is necessary to prevent the detention hearing from developing into a mini-trial or from being used a discovery device. The Court intends to limit the number of witnesses and the length of their testimony commensurate with the purpose and needs of the detention hearing. Defendant should bear these limitations in mind in making his proffer. Defendant may also submit written affidavits or declaration of witnesses that he wishes the Court to consider in support of his release. The Government may file an objection to the calling of any witness which the Court will consider in deciding whether or not to permit the witness to testify.

Defendant shall also make a proffer regarding video evidence he intends to present, including a description of its content and duration. As an alternative to playing video recordings during the hearing, Defendant may file with the Court and serve on counsel for the Government compact discs containing the video evidence that he wants the Court to consider in support of his release. Defendant and the Government will be afforded an opportunity to argue the import of the video evidence at the hearing.

The Court leaves it for the Government to decide whether it wishes to present witness testimony

at the detention hearing in response to any evidence that Defendant presents by proffer or witness testimony, bearing in mind that the burden of proving by clear and convincing evidence that Defendant poses a substantial risk of danger to other persons and the community rests with the Government.

### 2. Defendant's Argument that Continued Pretrial Detention Violates His Right to Due Process of Law.

Defendant Bundy argues that continued pretrial detention violates his Fifth Amendment right to due process of law. Defendant Bundy initially appeared on the superceding indictment in this case on April 15, 2016. He was already detained in the District of Oregon. Defendant was returned to that district shortly after his appearance in this district, where he remained in custody until after the conclusion of the District of Oregon trial. Counting all of the time since his temporary detention on April 15, 2016, Defendant has been detained by this Court for a period of just under 9 months. Although it cannot be precisely stated when Defendant's trial in this case will conclude, it is reasonably likely the total period of pretrial detention through the conclusion of trial will be 13 to 14 months, and perhaps longer depending on the length of the first and second trials.

In *United States v. Salerno*, 481 U.S.739, 746–47, 107 S.Ct. 2095, 2101–2 (1987), the Supreme Court upheld the constitutionality of the Bail Reform Act against a substantive due process challenge. The Court found that the Act is regulatory and not penal. The Court also stated that the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act. The Court "intimate[d] no view as to the point at which detention in a particular case might become excessively prolonged, therefore punitive, in relation to Congress' regulatory goal." *Id.* at 2102 n. 4. In *United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988), the Ninth Circuit stated that "[s]everal circuits have recognized that the length of pretrial detention raises a constitutional issue at some point." (citations omitted). The court, citing *United States v. Gonzales-Claudio*, 806 F.2d 334, 340 (2nd Cir. 1986), stated that the due process limit on the length of pretrial detention requires a case-by-case analysis under which the court considers the length of confinement in conjunction with the extent to which the prosecution bears responsibility for the delay that has ensued. *Id.*

In *United States v. Infelise*, 934 F.2d 103 (7th Cir. 1991), the Seventh Circuit held that the expected two year pretrial detention of the defendants did not violate their due process rights. The court

stated:

> If judge and prosecutor are doing all they reasonably can be expected to do to move the case along, and the statutory criteria for pretrial detention are satisfied, then we do not think a defendant should be allowed to maintain a constitutional challenge to that detention. To get to first base, therefore, he must show either the prosecution or the court has unnecessarily delayed bringing the case to trial . . . .

*Id.* at 104–5.

In holding that the defendants had failed to make such a showing, the court stated:

> There are twenty defendants all told (only four of whom-the four appellants-are being detained before trial), they are accused of a variety of serious crimes, the government's case is not weak, and the evidence is voluminous. We do not understand the defendants to be arguing that the government should not have joined all twenty, or that it has taken any other unnecessary step to delay the trial, or that the court system is responsible for the delay. The delay appears to be due to the time that the defendants' counsel are taking to prepare their clients' defense. Of course we do not criticize them for preparing as carefully as possible, but neither do we think that the length or depth of their preparation can obtain the release of defendants whose dangerousness has been amply demonstrated.
> *United States v. Zannino*, 798 F.2d 544 (1st Cir. 1986) (per curiam).

*Id.*

The circuit court decisions as to when pretrial detention becomes so excessive in duration as to violate a defendant's constitutional right of due process are summarized in *United States v. Ailemen*, 165 F.R.D. 571, 581 (N.D.Cal. 1996). *Ailemen* states that "most courts, when responding to due process motions of this kind, have tended to focus principally on three factors: (1) the non-speculative length of expected confinement; (2) the extent to which the government (the prosecution and/or the court system) bears responsibility for pretrial delay; and (3) the strength of the evidence indicating a risk of flight, a threat to the trial process and/or a danger to the community." *Id.* (citations omitted). Some courts have compared the length of the likely sentence to be faced by the defendant to the length of the pretrial detention. In general, the closer the length of pretrial detention gets to the probable sentence, the more likely the courts are to find a due process violation. *Id.*

*Ailemen* also divided the cases into three groups. The first group involves cases in which the length of detention already served, or of non-speculative expected detention is relatively short, between six months and one year. "In this setting, many courts refuse even to entertain due process challenges, concluding that the issue is not ripe." *Id.* at 583. Examples of cases in this category include *United*

*States v. Accetturo*, 783 F.2d 382, 387 (3rd Cir. 1986) (defendant's trial set to begin six months after detention); *United States v. Tortora*, 922 F.2d 889 (1st Cir. 1990) (defendant detained six months, trial expected to be in one or two months and last up to eight months); *United States v. Portes*, 786 F.2d 758, 768 (7th Cir. 1985) (defendant detained six months at time of decision); *United States v. Colombo*, 777 F.2d 96, 96–97, 100 (2nd Cir. 1985) (defendant detained seven months at time of decision and expected to be detained thirteen months to two years before completion of trial); and *United States v. DiGiacomo*, 746 F.Supp. 1176, 1182 (D.Mass. 1990) (due process violation had not yet occurred where defendant was detained for four months and trial was not expected to be completed for another year).

A second group of cases involve detention of a medium length, between nine months and two years. In these cases, the court generally discuss all three factors of the balancing analysis. *Ailemen* stated that cases in this group usually do not state that unnecessary delay attributable to the government plays "any special analytical role," but there appears to be some correlation between that factor and the outcomes of the cases. *Id.* at 583. The court cited *United States v. Gelfuso,* 838 F.2d 358, 359 (9th Cir. 1988), as an example of a case in the medium length group. *Gelfuso* found no due process violation where the defendants' trial was expected to begin nine or ten months after their detention began. *Ailemen* cited the following cases as medium length group cases in which no due process violation was found in the absence of unnecessary delay caused by the government or the court: *United States v. Orena*, 986 F.2d 628, 630–32 (2nd Cir. 1993); *United States v. Infelise,* 934 F.2d at 105; *United States v. Quartermaine,* 913 F.2d 910, 916–18 (11th Cir. 1990); *United States v. Jackson,* 823 F.2d 4, 7–8 (2nd Cir. 1987); *United States v. Berrios–Berrios,* 791 F.2d 246, 253–54 (2nd Cir. 1986), *cert. dismissed,* 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986); *United States v. Shareef,* 907 F.Supp. 1481, 1485–87 (D.Kan. 1995); and *United States v. Gotti,* 776 F.Supp. 666, 667, 672 (E.D.N.Y. 1991). As differentiated by *Ailemen*, there is some overlap between cases falling in the first and second groups. The third group of cases, not applicable here, involve pretrial detention that is expected to last two years or more. In those cases, continued detention has only been allowed where the prosecution or court was not responsible for any significant unnecessary delay and the threat the government's regulatory interests, prevention of risk of flight or danger to other persons or the community, is extraordinarily acute.

The length of Defendant Bundy's pretrial detention through the anticipated completion trial arguably falls within the middle category that requires consideration of all of the relevant factors. In terms of the causes of delay, the Court begins by noting that Defendant Bundy, as well as some of the other defendants, were also charged and detained in the District of Oregon case. These cases could not be tried at the same time. It is not unreasonable that the trial in this case was postponed until after the District of Oregon trial. This case has been designated as complex. Seventeen Defendants are currently charged. Discovery has been voluminous and numerous witnesses will be called to testify at trial. Numerous pretrial motions have been filed by the Defendants, including by Defendant Bundy. The Court has also found it necessary to order that the Defendants be tried in three groups. Under these circumstances, neither the Government nor the Court are responsible for untoward delay. As to the third factor— the strength of the evidence indicating a risk of flight or danger to the community— Defendant's continued pretrial detention remains warranted based on the charges alleged in the indictment and the rebuttable presumption under § 3142(e). The Court will, however, defer final consideration of this last factor until conclusion of the reopened detention hearing.

## CONCLUSION

Based on the foregoing, the Court will reopen the detention hearing to permit Defendant Bundy to present evidence showing that he is not a risk of nonappearance or a danger to the community. The Court however, will limit the presentation of evidence to ensure that the detention hearing does not develop into a mini-trial or a discovery device. Accordingly,

**IT IS HEREBY ORDERED** that Motion for Own Recognizance or Bail Pending Trial (ECF No. 1082) is **granted** to the extent that the Court will reopen the detention hearing, subject to the following conditions:

1. Within seven (7) days of the filing of this order, Defendant shall file with the court a specific proffer of the witnesses he wishes to have testify at the hearing and how their testimony will negate the government's contention that he is a danger to the community, or will rebut the presumption created by the statute that he should be detained. Defendant shall also file a proffer of any video evidence he intends to present at the hearing, including a description of its content and duration. Alternatively, Defendant may file copies of the video recordings with the Court and serve the same on the

Government for review prior to the hearing.  The Court will permit the parties to present argument at the hearing regarding import of the video recordings.

2. Defendant may submit written affidavits or declarations of witnesses that he wishes the Court to consider in support of his release.

3. The Government may file an objection to witnesses identified by Defendant.  Prior to the hearing, the Court will determine which witness, if any, will be permitted to testify.  Defendant, however, may testify at the hearing if he chooses to do so.

4. The Government may present additional proffers or witness testimony at the detention hearing in response to any evidence that Defendant presents by proffer or testimony.

**IT IS FURTHER ORDERED** that Defendant's request that he be released on the ground that continued pretrial detention violates his right to due process of law is **denied**, without prejudice.

**IT IS FURTHER ORDERED** that the reopened detention hearing is set for January 24, 2017 at 1:30 p.m. in Las Vegas Courtroom 3A.

DATED this 9th day of January, 2017.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge